Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Civil Action No. 1:23-cv-01771-LMB-WBP

TAREK EL-GHAZAWI, Ph.D., and
THINKING LIGHTS, LLC, a Virginia
limited liability company,

     Plaintiffs,

vs.

OPTELLIGENCE, LLC, a Delaware
limited liability company; VOLKER J.
SORGER, Ph.D.; HAMID DALIR, Ph.D.;
and BEHROUZ MOVAHHED NOURI,

     Defendants.

---------------------------------------------------------

VIDEOTAPED DEPOSITION

OF

VOLKER J. SORGER, Ph.D.
taken on behalf of the Plaintiffs
pursuant to a Notice of Taking Deposition

DATE:          Friday, August 2, 2024

TIME:          9:32 a.m. to 4:17 p.m.

PLACE:        Scribe Associates, Inc.
               201 Southeast 2nd Avenue, Suite 207
               Gainesville, Florida

REPORTER:     Ingrid T. Cox, RPR
               Notary Public, State of
               Florida at Large

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 2

```
 1   APPEARANCES:

 2      GLENN B. MANISHIN, ESQUIRE
        Paradigm Shift Law, LLP
 3      11410 Reston Station Boulevard, Suite 586
        Reston, Virginia 20190-5439
 4      (202) 256-4600
        glenn@manishin.com
 5
             Attorney for Plaintiffs.
 6
        JOHN W. LOMAS, JR., ESQUIRE
 7      Eversheds Sutherland
        700 Sixth Street Northwest, Suite 700
 8      Washington, D.C. 20001-3980
        (202) 220-8049
 9      johnlomas@eversheds-sutherland.com

10           Attorney for Defendants.

11
     ALSO PRESENT:
12
     TAREK EL-GHAZAWI, Ph.D.
13   John LuBrant, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

SCRIBE ASSOCIATES, INC.
GAINESVILLE   OCALA   LAKE CITY   STARKE

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

1    Thinking Lights concept before 2019"?

2       A.  Can you repeat the question?

3       Q.  Yes.  Your answer said, "Dr. Sorger and

4    El-Ghazawi developed the Thinking Lights concept before

5    2019."  It continues.  And I'm asking what is the --

6    what was the Thinking Lights concept you're referring

7    to?

8       A.  So the question was whether -- can you -- I need

9    you to ask it one more time.  Are you asking whether

10   this statement is correct or incorrect or --

11      Q.  No.  I'm asking what is the meaning of this

12   document where it says the two of you, Dr. Sorger and

13   El-Ghazawi, developed the Thinking Lights concept?  What

14   was the Thinking Lights concept?

15      A.  Ideas, brainstorms about a utilization of

16   inventions.  There was an idea or a concept of

17   brainstorming activity about such possibility, yeah,

18   that's what this refers to.

19      Q.  Was the Thinking Lights concept limited only to

20   ideas and brainstorming or did it progress beyond that

21   at any point?

22      A.  It did not progress beyond that point.

23      Q.  Was there a company formed by you and Dr.

24   El-Ghazawi called Thinking Lights, LLC?

25      A.  On paper, yeah.  It was formed, yeah.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 26

1   agreement.

2      Q.  The last portion says, "the discussions did not

3   get close to yielding a full agreement;" is that

4   accurate, sir?

5      A.  In my opinion, it is.

6      Q.  Just in general do you recall ever being

7   presented by George Washington University or its

8   representatives with a set of documents for a

9   relationship between Thinking Lights, LLC, and GW that

10  were prepared for signing?

11     A.  I do recall that offering, yeah.

12     Q.  And that was after 2018, was it not?

13     A.  It was.

14     Q.  Sometime in 2020; is that right?

15     A.  That is correct.

16     Q.  One of the persons with whom the negotiations

17  occurred was named Jerry, and excuse me if I don't

18  pronounce his last name right, Comanescu; is that right?

19     A.  He was employed at TCO, technology

20  commercialization office, which was involved in this --

21  in these negotiations.

22     Q.  And it would be fair to say that he was one of

23  the principal sources of contact for the discussion

24  between the two of you with respect to Thinking Lights

25  and GWU?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 32

1    presented in 2018, so let's start with 2018.

2       A.  I think excited is a strong word.  I was curious.

3       Q.  Okay.  Was part of the plan of Thinking Lights

4    for you and Professor El-Ghazawi to go into business

5    together?

6       A.  That was a consideration.

7       Q.  Isn't it fair to say that you formed the LLC

8    together in order to have a legal entity to conduct

9    research and other business?

10      A.  We formed a legal entity.

11      Q.  Well, then if I didn't describe it right, for

12   what purpose did you form the legal entity, sir?

13      A.  The brainstorming, the main idea and concept that

14   were considered was to take a certain set of

15   intellectual property and go about and monetize them and

16   -- yeah.

17      Q.  Do you have an objection to the use of the word

18   commercialization as opposed to monetization?

19      A.  No.  Commercialization or monetization, either

20   one is fine.

21      Q.  So would it be fair to say that Thinking Lights

22   would be an entity that would do something with the GW

23   owned patents on which you were the inventors to

24   commercialize them?

25      A.  Well, but the question is what's that something.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 45

1    LLC.  Do you recognize that to be the operating

2    agreement?

3       A.  It appears that way.  I haven't read every word

4    of it, but I believe so.

5       Q.  And is there any doubt in your mind that the two

6    of you actually signed that agreement?

7       A.  I do recall signing this agreement --

8       Q.  Okay.

9       A.  -- jointly.

10      Q.  Take as much time as you want, but does that

11   agreement reflect anything about the development of

12   patents to be licensed by GWU to Thinking Lights or to

13   be sold by Thinking Lights?

14      A.  Just for the record, I do not recall right now.

15   I can read through it and if you would like to point me

16   to a particular point --

17      Q.  I can't.  I'll represent for the record that

18   there is nothing in there about licensing of patents.

19      A.  Right, that sounds about right.

20      Q.  Does that operating agreement reflect what you

21   anticipated to be the business model or business plan

22   for Thinking Lights?

23      A.  This particular version does fall short of that.

24      Q.  Were there -- I'm not aware there were later

25   versions.  Are you suggesting there were later versions

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 46

1    of the operating agreement?

2        A.  I'm not suggesting that.

3        Q.  Okay.  I didn't think that there were.  Does that

4    operating agreement include any attachment or exhibits

5    listing patents that were going to be involved in the

6    operation of that business, that is the patents we were

7    discussing that you were attempting to negotiate a

8    license from with GW?

9        A.  Again, I need to read through this.  I do not

10   recall that it does.

11       Q.  Okay.  You do recall that there was a list of

12   patents associated with some of the agreements proposed

13   by GWU, correct?

14       A.  Correct.

15       Q.  I'm just curious.  Did the operating agreement

16   reflect any joint decision by you and Dr. El-Ghazawi to

17   put any money into that company called Thinking Lights?

18       A.  Did this document reflect --

19       Q.  Yes.

20       A.  -- us putting -- the document -- the document I

21   don't think mentions any numbers or any cost

22   contributions --

23       Q.  And I think if you --

24       A.  -- that I recall.

25       Q.  If you look to the section near the end called

SCRIBE ASSOCIATES, INC.
GAINESVILLE    OCALA    LAKE CITY    STARKE

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 47

1    capital contributions.  It's the page -- page 14 of the

2    document.  It has the red Bates stamp number that ends

3    in 069.

4        A.  14, yes.

5        Q.  Exhibit A?

6        A.  Yes.

7        Q.  You'll see percentage interest is 50-50?

8        A.  Uh-huh.

9        Q.  So you were joint owners, equal owners?

10       A.  Yes.  We signed this document, correct.

11       Q.  Yes.  And under capital contribution there's

12   nothing for either party.  Did each of you put some

13   money into Thinking Lights to pay for things like a

14   domain name and office, bank account, et cetera?

15       A.  We did.

16       Q.  And an office was set up?

17       A.  There was an office, yeah.  Some form of office

18   was paid for.

19       Q.  And a domain was created and a website was at

20   least starting to be developed?

21       A.  That's correct.

22       Q.  Were there any other members of Thinking Lights

23   other than the two of you?

24       A.  Not that I recall.

25       Q.  Did Thinking Lights have a board of directors?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

1    business?

2        A.   Possibly, but they also may not.

3        Q.   Did you -- what was your understanding of your

4    role in Thinking Lights then if you don't understand

5    what manager means?

6            MR. LOMAS:   Object to form.

7            THE WITNESS:   I am the founder, a cofounder of

8        the entity.

9    BY MR. MANISHIN:

10       Q.   Okay.  Anything else?

11       A.   I guess partners may be another word for it.

12       Q.   I'm sorry, what was the word?

13       A.   Maybe partner is another word for it.

14       Q.   Partner, okay.  And in light of the 50-50

15   division that we looked at before in this document you

16   would be equal partners?

17       A.   Naturally.

18       Q.   I'm just curious, with regard to any of the

19   little minor steps that we talked about, the bank

20   account and the office and the website, did either or

21   both of you contribute some money to that joint bank

22   account to fund those activities?

23       A.   Well, since I didn't have access to the account I

24   wouldn't know other than the first time of instigating

25   the account.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 52

1    Q.  Did you provide money in some fashion to Thinking

2   Lights to fund some of those activities?

3    A.  Other than this initial step?

4    Q.  I'm not sure you've told me what the initial step

5   was, but please do.

6    A.  Yeah.  So when one creates an account the bank

7   wants some minimum amount or some amount of funds in the

8   account.  And I recall we did put some money, I think it

9   was -- I don't know how much it was.  A few hundred

10   dollars total or each or something on that order, less

11   than a thousand each for sure.  And we put that into the

12   account.  I do not recall putting anything else into the

13   account for my side after that or having been asked for

14   it either.

15    Q.  Do you know whether Professor El-Ghazawi funded

16   any of those activities through the account or otherwise

17   after the initial investments?

18    A.  I'm not aware of this.  You can ask him.

19    Q.  No.  I was just asking if you knew.

20    A.  I did not know.

21    Q.  Your counsel asked him the other day.

22     MR. MANISHIN:  We've been going for an hour and a

23    half.  It's time for a little break.  Let's take 15

24    minutes.

25     VIDEOGRAPHER:  Time going off the record 11:04.

SCRIBE ASSOCIATES, INC.
GAINESVILLE   OCALA   LAKE CITY   STARKE

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 57

1    agreement.

2         MR. LOMAS:   Object to form.

3    BY MR. MANISHIN:

4      Q.  That may be a paraphrase, but I think we can

5    agree it's close.  And pull out Exhibit 1 if you need to

6    check.  Would you agree that Plaintiffs' Exhibit 3 is a

7    set of documents presented by George Washington

8    University to Thinking Lights as a final agreement ready

9    for signing?

10     A.  I object to the word final, but it is a version

11   that is considered by their side for signing, for

12   signing by George Washington University.  Obviously

13   that's what the title implies.

14     Q.  Did you object to the instructions to sign the

15   documents that are included in this e-mail?

16     A.  I do not.  I did not.

17     Q.  Did not.  Did you sign any of the agreements?

18     A.  I did not sign these agreements.

19     Q.  Were you requested by Professor El-Ghazawi to

20   sign the agreement?

21     A.  I was not, not that I recall.

22     Q.  Okay.  Not orally and not in writing?

23     A.  That is correct, not, neither.

24     Q.  So in your recollection between the two of you

25   what happened after you, Volker, and Tarek received

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 92

1  BY MR. MANISHIN:

2      Q.  Do you recall whether at the time you expressed

3  any objections to terms or provisions of the various

4  agreements presented by GW on or about March 1, 2020?

5      A.  I don't recall presenting much objection to those

6  documents.  I did -- since we've yet again established

7  that the operating agreement, this is something also

8  Tarek shared just recently as well, was something on

9  Legal Zoom, it was quick done just to have something

10  because it was void of a proper structured agreement

11  with activity stated with, in other words -- what's the

12  word?

13      Q.  It was incomplete?

14      A.  It was incomplete and it was -- the diligence for

15  a proper company was -- with that agreement was

16  insufficient.  I did raise that, I think, on March 5th,

17  6th around timeframe.  I raised that as something that

18  we should be looking into and -- but no action was taken

19  by Tarek to engage in that to look into this.

20      Q.  I think you referenced the fact it was prepared

21  via Legal Zoom.  Neither you nor Tarek hired or the

22  entity hired an attorney to work on these documents with

23  you, did you?

24      A.  That's correct.

25      Q.  And so there was no attorney advising you on what

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 93

1    the terms or provisions or contents of an operating

2    agreement should be other than whatever you got from or

3    through Legal Zoom?

4        A.  Yes.  And that was in 2019.  So certainly I've

5    had time to do that and at some point I raised that, but

6    I did not get any response or feedback about it.

7        Q.  But it wasn't done?

8        A.  Elaborate.

9        Q.  Supplementing the operating agreement for the

10   provisions that you agreed were incomplete and you

11   believed to be needed.

12           MR. LOMAS:  Object to form.

13           THE WITNESS:  Correct.

14   BY MR. LOMAS:

15       Q.  Did you ever propose in writing supplementing or

16   changing the operating agreement to make it complete?

17       A.  I did on March 4th, 5th or March 6th.

18       Q.  Was that in writing do you believe?

19       A.  E-mail, in writing.

20       Q.  I haven't seen a copy of that e-mail, but, again,

21   subject to your attorney's objections, would you have a

22   problem providing that to us?

23       A.  I'm happy to oblige to provide that.

24       Q.  Let's turn to Optelligence, LLC.  I think we

25   established before that you at least know the name of

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                                5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 98

1   imagine that my client understands.

2        Did you inform Professor El-Ghazawi of your

3   negotiations with GWU regarding the entity, regarding

4   the concept that eventually became Optelligence?

5        MR. LOMAS:  Object to form.

6        THE WITNESS:  Again, we were in a situation where

7    we were one and a half years into negotiations.

8    Things went certainly not very -- you saw early

9    excitement from -- certainly from GW.

10        In February of 2020 another entity showed up that

11    wanted -- that had interest in patents that TL,

12    Thinking Lights, contemplated.  As I shared earlier,

13    Tarek El-Ghazawi -- Tarek immediately responded to

14    that and I did not.  And then George Washington

15    University reached out again for us to sign, as we've

16    discussed, and I indeed was waiting for, you know, my

17    lead negotiator and sort of strategist that also had

18    some of the slides, tried to use that process to

19    sign, et cetera.  So that's where we were.

20        So what I noticed is I got three signals.  I got

21    a signal from George Washington University, look,

22    we're really just lukewarm with this whole idea in

23    the first place, one and a half years leading up to

24    two years.  I had a signal that George Washington

25    University and my colleague and Thinking Lights is

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 99

1      engaging with a third entity who is actually

2      considering taking patents out of this portfolio and

3      my colleague is engaging in that.  I'm not initially

4      for, what, ten days or so.  I was a second ping that

5      was needed.

6          So then we were both in the meetings.  Meetings

7      were held with the Canadian entity and things were

8      discussed and there was -- there seemed to be a lot

9      of excitement, and to my surprise Thinking Lights did

10     not really -- wasn't really pursued.  Again, Tarek

11     did not -- kept negotiating for the entity whilst

12     engaging with this other entity which clearly wanted

13     some part of this portfolio.

14         So as I looked at all of this, I stepped back and

15     said look, I'm -- GW at this point has apparently

16     either given up entirely or at least for right now

17     given up on this idea.  And, as we said before, they

18     are -- it's not a joint venture, but they were needed

19     in order for this to -- for this company, for this

20     business model to even be valid.  And then the

21     activity with another entity that had took now -- had

22     interest in some of these patents, all of this

23     essentially led to me I decided I move on.

24         MR. MANISHIN:  Could you read back just my

25     question, please?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                          5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 100

1          (The requested portion of the transcript was read

2     by the court reporter.)

3          MR. LOMAS:  Object to form.

4     BY MR. MANISHIN:

5        Q.  So I will restate the question.

6          Did you tell Professor El-Ghazawi of your

7     negotiations with GWU regarding what eventually became

8     an entity called Optelligence, LLC?

9          MR. LOMAS:  Object to the form, foundation.

10         MR. MANISHIN:  Excuse me?

11         MR. LOMAS:  Object to form and foundation.

12         MR. MANISHIN:  Okay.

13         THE WITNESS:  I became aware in an e-mail that

14         Tarek shared in September 2020 that --

15    BY MR. MANISHIN:

16       Q.  That's later.  I've just asked you did you inform

17    him?  Simple question, did you tell him?

18         MR. LOMAS:  Object to form.

19         THE WITNESS:  I -- about the incorporation of

20         Optelligence?

21    BY MR. MANISHIN:

22       Q.  The whole idea about Optelligence, whatever the

23    idea was that became Optelligence, did you tell him?

24    Did you tell him you were abandoning Thinking Lights and

25    going separately?

SCRIBE ASSOCIATES, INC.

GAINESVILLE   OCALA   LAKE CITY   STARKE

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                                      5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 101

1    A.  It's my understanding that the -- there was an

2  e-mail that George Washington University wrote to us on

3  May where they shared their results again of this

4  three-months period from February 5th to, again, that

5  was done May 5th, and during this timeframe they then

6  eventually summarized what they had decided to do with

7  their ownership patents for this particular patent and

8  they in that e-mail then was also -- or were questioning

9  what we should do with those patents that are in the

10  portfolio remaining.

11    Q.  Okay.  So you're unable to tell me yes or no?

12       MR. LOMAS:  Object to form.

13       THE WITNESS:  So I don't recall specifically

14    mentioning Optelligence in -- I guess you seem to be

15    focused on a certain timeframe during which you're --

16  BY MR. MANISHIN:

17    Q.  I didn't give a timeframe.  Did you ever tell

18  him?

19       MR. LOMAS:  Object to form.

20       THE WITNESS:  I don't recall when.

21  BY MR. MANISHIN:

22    Q.  Okay.  Are you saying you did, but you just don't

23  remember when or something else?  Let me withdraw the

24  question.

25       Isn't it a fact, sir, that you entirely kept your

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 102

1    negotiations with GWU about your separate venture secret

2    from Professor El-Ghazawi?

3       A.  As I shared, I moved on personally based on the

4    signals that I saw from GW and from Tarek and from Tarek

5    and GW interacting with a third entity that had the same

6    idea with Thinking Lights.  So I moved on from that

7    activity.

8       Q.  So the answer to my question is yes, is it not?

9       A.  No, it's not.  That implies intent.  Your

10   question implied intent.  That was not my intent.

11      Q.  If your intent was not to keep it secret why

12   didn't you tell him?

13      A.  Why should I?

14      Q.  Do you feel you had an obligation to your coequal

15   50-percent partner in Thinking Lights to tell him that

16   you had abandoned that venture and were going separately

17   on something else?

18      A.  The negotiation with Tandem Launch and the not

19   stepping up intervening or inter -- the fact that Tarek

20   did -- as a lead negotiator did not intervene.  He

21   engaged in these discussions in the first place.  And

22   the fact that George Washington University -- everyone

23   seemed to be interested in something else.

24      Q.  I see.

25      A.  And -- which is their right.  That's fine and

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 108

1    yeah.

2       Q.  The details aren't relevant, but you basically --

3    you weren't going under the standard patent policy?

4       A.  Correct.

5       Q.  You were doing something else, a new model?

6       A.  Yes.

7       Q.  Okay.  Can you explain to me why if Tandem Launch

8    was such an impediment to Thinking Lights starting in

9    February, on March 1, 2020, GW, through Jerry C., would

10   have presented the final documents for signing?

11      A.  I don't know what GW was thinking.

12      Q.  Okay.  Let's turn to Exhibit 12 then.  This is an

13   e-mail dated May 4th from, again, Jerry Comanescu to the

14   two of you, Tarek El-Ghazawi and Volker Sorger.  Hi,

15   Tarek and Volker.  Pleasantries, et cetera.  Is it fair

16   to describe this e-mail as the one that you were talking

17   about?  Excuse me, I withdraw the question.

18        Does this e-mail reflect your explanation before

19   about GW's desire to move in a different direction and

20   divide the portfolio into separate segments?

21      A.  I do not read the word desire in here.  I mean,

22   we can read it together, okay?  A resolution to the

23   above-mentioned issues, which is essentially the fact

24   that GW -- the first two paragraphs, if I recall, and

25   I'm skimming them over, summarizes verbiage to the

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 118

1   was formed; is that right?

2       A.  It is a year later after Optelligence licensed --

3   entered into the agreement with GW.

4       Q.  Yeah, I'm sorry.  I used formation.  I was

5   referencing February 2021 when the agreement with GW was

6   reached.  Do you have a copy of that agreement, by the

7   way?

8       A.  I do have a copy of this agreement.

9       Q.  And do you have it electronically somewhere on a

10  laptop or a cloud server or something like that?

11      A.  Supposedly.

12      Q.  Okay.  Does Optelligence have the right to

13  transfer any of the -- to license or transfer any of the

14  patents for which it reached agreement with George

15  Washington University?

16      A.  I need to look into the agreement, but I believe

17  sublicensing was an option with certain stipulations

18  probably.  But as a general term I believe it was an

19  option.

20      Q.  And does George Washington University have an

21  equity interest in Optelligence, LLC?

22      A.  It -- that agreement stated a share for George

23  Washington University.

24      Q.  Do you know what that share was?

25      A.  Five percent.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)
5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 120

1    five percent George Washington University, it was -- I

2    believe that was the case.  30 percent to Hamid Dalir,

3    and 30 percent Behrouz Nouri, and the remaining part was

4    with me.

5        Q.  You had 35?

6        A.  35.

7        Q.  Okay.  So you had the largest share of the equity

8    in that company?

9        A.  Uh-huh.

10       Q.  Which is fair because it was your idea?

11       A.  I'm not sure whether it's fair, but that was the

12   fact.

13       Q.  Okay.  Well, I would assume you did not want to

14   enter into an agreement with other equity holders of the

15   company that was unfair?

16       A.  Fair is an interesting term.

17       Q.  Okay.  Were those individuals you mentioned,

18   Hamid Dalir and Behrouz Movahhed Nouri, for the

19   reporter's benefit we'll give you the spellings later,

20   were those individuals part of the company when it was

21   formed?

22       A.  No.

23       Q.  Were they part of the company before the

24   agreement with George Washington University was entered

25   into in February of 2021?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 121

1    A.  Yes, if barely.  I need to look exactly the

2  timing.  Maybe by a month or two, give or take.

3    Q.  Briefly describe the background of your

4  relationship with Hamid Dalir, please, including whether

5  you worked with him in connection with any other

6  companies.

7    A.  Hamid -- at the George Washington University we

8  had the subcontract, meaning George Washington

9  University was a subcontract to an SBIR -- or STTR grant

10  or SBIR, I don't remember, when he was in a Texas

11  entity, in Texas SME, small and medium enterprise.

12      COURT REPORTER:  I'm sorry, say that again.

13      THE WITNESS:  He was -- he had -- we had -- so

14    the relationship was to have -- that we had in an R&D

15    research (inaudible) for an entity that he was with.

16    The entity was a small and medium enterprise in

17    Texas.

18  BY MR. MANISHIN:

19    Q.  Do you recall the name of that entity, sir?

20    A.  Omega Optics, Incorporated.

21    Q.  And I believe we've discussed before that Mr.

22  Dalir was affiliated with GWU and I've forgotten whether

23  he was a student or a graduate student or employee, but

24  he was with the university when both you and Tarek were

25  there?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 122

1    A.  Yes.  I mean, right, yeah.  I was there, Tarek

2  was there, and then he came and departed.

3    Q.  Was Mr. Dalir an investor in Optelligence in any

4  way?

5    A.  I wouldn't characterize him as such.

6    Q.  The other person you mentioned, last name Nouri,

7  N-O-U-R-I, was Mr. Nouri an investor in Optelligence in

8  any way?

9    A.  Yeah, that's a -- that's a question I don't even

10  know the answer myself to really.

11    Q.  Okay.  It seems pretty straightforward.  Did he

12  contribute money to the company in exchange for stock or

13  shares or options or anything like that?

14    A.  And the answer is no.

15    Q.  Okay.  Did Optelligence, LLC, raise money from

16  third-party investors?

17    A.  They did.  A single investor.

18    Q.  Was that investor Francis Conti of MDD

19  Investments?

20    A.  Yes.

21    Q.  Is that an Austin based company?

22    A.  I believe so.

23    Q.  And Optelligence is based in Austin, correct?

24    A.  No.

25    Q.  I recognize that there was a Maryland location,

SCRIBE ASSOCIATES, INC.
GAINESVILLE   OCALA   LAKE CITY   STARKE

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 123

1    but is the company's headquarters officially in Austin,

2    Texas?

3       A.  Well, it's incorporated in Delaware.  It operated

4    -- initially when I just formed it essentially out of my

5    own house and then it operated out of the Maryland

6    location.  I do not know where they're operating since

7    the last 12 or 18 months, if that's Austin now or not.

8       Q.  Why is that?

9       A.  Well, I'm not very much involved with the entity.

10   In fact, I'm not a manager or director since 2022.  So I

11   don't know at what point or how they would characterize

12   their headquarters.  We would need to ask them.

13      Q.  Okay.  Because of your action I'm not sure what

14   you said.  I just want to make clear.  You haven't been

15   a director or an officer of that company since when?

16      A.  September of 2022.

17      Q.  September 2022.  What happened in September 2022,

18   sir?

19      A.  Well, in September 2022 they executed a fiduciary

20   act.

21      Q.  A what?  Fiduciary?

22      A.  Fiduciary act.  Thank you.  And as such I was

23   just a member, not a director or manager or

24   decisionmaker in the entity.

25      Q.  Did you retain your equity interest in the

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 124

1    entity?

2        A.  I did not.

3        Q.  Okay.  And you said it was a fiduciary act, is

4    that how you -- what you called it?

5        A.  I believe that's the legal term for that.

6        Q.  I don't know.  That's why I'm asking.

7        A.  Yes.

8        Q.  And I'm not asking for your legal opinion.  Okay.

9    Can you briefly tell me what precipitated that change?

10       A.  Well, the -- what precipitated for them was to --

11   the possibility -- or not even possibility.  Let me use

12   a different word.  The -- for raising the, in this case,

13   potential of a claim by Tarek on the entity, on

14   Optelligence.

15       Q.  Okay.  Now, correct me if I'm wrong, but my

16   recollection is that this lawsuit was filed in December

17   of 2023.  Is that consistent with your recollection?

18       A.  Yeah, yes.

19       Q.  And I remember writing a demand letter, I think

20   it was addressed to you personally, I don't recall

21   specifically, and that was sometime around Thanksgiving

22   of 2023.  Is that generally accurate?

23       A.  Yes.

24       Q.  Okay.  How did you become aware of a claim by

25   Tarek that you referred to in 2022?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 125

1    A.  Well, I remember us sitting down and having lunch

2    or dinner and they were -- there was discussions about

3    -- well, how did it go.  I think we had -- okay.  We

4    still had joint intellectual property with the George

5    Washington University.

6    Q.  Who's the we there?

7    A.  Tarek and myself.  Which had lain dormant.  And

8    the question of what to -- or if and what to do with

9    those were -- so the potential came up between the two

10   of us and were brought to the table.  And then Tarek --

11   and that led to -- it essentially led into this behavior

12   of these two other -- of Hamid and of Dalir and Nouri in

13   taking this action.

14   Q.  Is it wrong to say that you were squeezed out of

15   the company?

16   A.  I don't know if squeezed out is the right phrase,

17   but -- well, certainly with that the powers and the

18   operation for that matter are very shifted in the

19   entity.

20   Q.  So I think, as you described the percentages,

21   Dalir and Nouri controlled 60 percent of the company,

22   which is a majority.  Is it your recollection under the

23   bylaws or whatever that a majority could oust an officer

24   and director?

25   A.  I would need to look into the bylaws.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 130

1    gentleman on the left, I don't know who he is.

2       Q.  That suggests to me that that photograph was not

3    taken at the September 6th meeting of Ben, Hamid,

4    yourself and Tarek?

5       A.  I do not recall being in this moment.

6       Q.  Okay.  There's another photograph following the

7    page that you had initially looked at, the following

8    page 378 of you shaking hands with Tarek.  Do you

9    recognize yourself and Tarek in that photograph?

10      A.  Yes.

11      Q.  Was that photograph taken on or about the meeting

12   referenced in the minutes?

13      A.  Let me check whether this refers to minutes, but

14   it might.

15      Q.  If you don't know, you don't know.

16      A.  I do remember the meeting for sure obviously,

17   yes.

18      Q.  Do you remember shaking hands at the end of the

19   meeting?

20      A.  I do remember, yeah.

21      Q.  Okay.  And what did you shake hands on?

22      A.  That wasn't clear when we shook hands, I guess.

23   We discussed -- I can share what we discussed.  We

24   discussed shares in Optelligence and those shares, I

25   think, was what we shook hands on.  And then after we

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 131

1    shook hands -- do you want to confer with your client

2    or --

3        Q.   No.  I'm able to listen with one ear.

4        A.   So, yeah, we shook hands on a share portion of

5    Tarek.  That's how I remember it.

6        Q.   Okay.  On page one there appears to be a summary

7    and it refers to -- under the line it says Volker 4/2020

8    OP 10/2020 Ben joined.  Ben is Behrouz Movahhed Nouri?

9        A.   I guess.

10       Q.   And 11/2020 Hamid joined.  Does that help refresh

11   your recollection of when those individuals joined you

12   in Optelligence?

13       A.   No, that doesn't make sense.  No, that's

14   definitely factually incorrect because Hamid joined

15   first.  Hamid introduced Behrouz, Ben, so it cannot be

16   this way around at all.

17       Q.   So that's a mistake?

18       A.   It got switched or --

19       Q.   It says Optelligence 4/2020.  Is that accurate,

20   is that when you formed the company, April of 2020?

21       A.   I think it was March 2020.

22       Q.   Oh, okay.  So was it before or after March 1,

23   2020, when Jerry sent those agreements for signature?

24       A.   It was after.

25       Q.   And if you look at page two of the minutes, which

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 132

1    is stamped 369, it summarized and says, "Volker

2    consented to transfer ten percent of his shares from his

3    total 35 percent to Tarek at no cost retroactive.  And

4    Tarek El-Ghazawi will lose the right to sue Optelligence

5    and Volker Sorger as a result."

6         Did you reach agreement with Tarek and the other

7    two individuals at the meeting to transfer ten percent

8    of the shares to Tarek as a settlement of the claim?

9         MR. LOMAS:  Object to form.

10        THE WITNESS:  Well, exactly.  First of all, it

11     was not established that there was a claim or there

12     even is today a claim.  So -- but in -- the fact is

13     we did enter in discussions about how to build a

14     joint business.  So that happened.

15        And now if use the word settle, we discussed in

16     that meeting the ten percent, as we said earlier

17     already, and now that's -- so that's something we

18     reached in that meeting as a number that we were

19     contemplating, yeah.

20   BY MR. MANISHIN:

21     Q.  So I was wrong in characterizing it as a

22   settlement meeting?

23        MR. LOMAS:  Object to form.

24        THE WITNESS:  Possibly, yes.

25

SCRIBE ASSOCIATES, INC.
GAINESVILLE    OCALA    LAKE CITY    STARKE

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

Page 133

1    BY MR. MANISHIN:

2       Q.  I thought you objected to my use of the word

3    settlement.

4            MR. LOMAS:  Object to form.

5            THE WITNESS:  Yes, exactly.

6            MR. LOMAS:  Was that a question?

7    BY MR. MANISHIN:

8       Q.  Did you disagree with my characterization of

9    this, my question of whether this was a settlement

10   meeting?

11      A.  I do disagree with this because it's not

12   established that there is a claim.

13      Q.  Okay.  Was there a lawyer advising the three of

14   you from the Optelligence side with regard to the

15   meeting that occurred on September 6, 2022?  I just

16   asked whether there was a lawyer advising you.

17      A.  Not that I'm aware of.  I do not know whether a

18   lawyer was advising the other two gentlemen.

19      Q.  Do you know who drafted the minutes?

20      A.  I do not recall.  Possibly Hamid or Ben.

21      Q.  Am I correct in my assumption that these minutes

22   were not drafted by a lawyer for the company?

23      A.  That is -- that's correct.

24      Q.  Okay.  Was an individual named Peter Weinstein

25   acting as the lawyer for Optelligence as of September 6,

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 134

1    2022?

2       A.  I do not remember.  He at some point became an

3    attorney for the entity as it appears.  When that

4    happened exactly, we need to look.  I honestly don't

5    recall at what point he became.  It would be

6    speculation.

7       Q.  Is it your recollection that the reference on

8    page two stamped 371 that you consented to transfer ten

9    percent of your shares to Tarek, is that inaccurate?

10      A.  No, it's not inaccurate.

11      Q.  And is that what you shook hands on?

12      A.  That's my recollection.

13      Q.  Did you renege on that agreement the next day?

14      A.  I didn't hear the question.

15      Q.  Did you renege on that agreement the next day?

16      A.  Renege means denounce?

17      Q.  Did you follow through on the handshake and

18   present an agreement for Tarek to take ten percent of

19   your shares, ten percent of the shares?

20      A.  Well, that was the intent that we reached.

21      Q.  Yes?

22      A.  Yes.

23      Q.  And was that offered to him by the company or by

24   you?

25      A.  That's my understanding of the handshake we took.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 136

1    Q.  Okay.  You also said that you had a net loss from

2    your participation in Optelligence and we talked about

3    the distributions which you characterized as about

4    $180,000; is that a fair summary?

5    A.  Uh-huh.

6    Q.  What were the negative parts that caused it to be

7    a net loss?

8    A.  Well, again, I think I even earlier also

9    mentioned the question is what do we include or exclude

10   into this entire operation.  For one, I made a capital

11   contribution to the entity of $75,000 in cash.  That

12   directly goes off.  And then --

13   Q.  I'm sorry, that --

14   A.  I made a capital contribution to the entity of

15   $75,000.

16   Q.  That?

17   A.  Went from my bank account to the company.

18   Q.  Okay.

19   A.  Again, mentally subtract from the 182,000, right.

20   Q.  And that capital contribution was not returned to

21   you?

22   A.  Correct.

23   Q.  Okay.  What were the other negative elements?

24   A.  Well, all of this activity and legal fees.

25   Q.  Legal fees.  Is it correct that you've agreed to

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 137

1   pay the legal fees of Hamid Dalir and Behrouz Movahhed

2   Nouri in connection with this lawsuit?

3      A.   That is an incorrect statement.

4      Q.   Okay.  Can you correct the statement?

5      A.   Let's see how exactly was it worded.  Do we have

6   a copy of that agreement?

7      Q.   I'm not asking for the technical terms.  I just

8   want to know what's the nature of any financial

9   relationship between you and the now dismissed two

10  individual defendants, Dalir or Nouri, financially.

11     A.   What is the relationship between me and these two

12  other individuals relating to this case?

13     Q.   Yes, sir.

14     A.   The answer must be TBD, to be determined.

15     Q.   Okay.  I will represent for the record that I've

16  informed counsel for Optelligence, which is as of now

17  Peter Weinstein, that I intend to take a deposition of

18  the corporation.  Under the federal rules for civil

19  procedure a deposition of corporation is represented by

20  a corporate designee.  Mr. Weinstein has said that you

21  have to be the corporate designee because it is your

22  company.  Does that make any sense to you?

23     A.   No.

24     Q.   Is Optelligence still in existence, to your

25  knowledge?

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                    5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 146

1   copy of the agreement between Optelligence and MDD?

2     A.  I do.

3        MR. LOMAS:  And I just want to make one comment

4   on the record.  We need to review -- a couple of

5   those documents may have confidentiality provisions.

6   And so I just ask that the testimony about any of

7   that right now just be kept confidential between the

8   parties until we can confirm if we have any

9   obligation to notify the other party about it.

10       MR. MANISHIN:  Okay.  And I'll state for the

11   record we told the court that if we needed to enter

12   into a protective order we would do that.  And so --

13       MR. LOMAS:  Yeah, yeah.  I don't foresee an

14   issue.  I just was wanting to let you know just to

15   protect it before we got the transcript out.

16  BY MR. MANISHIN:

17    Q.  And I'll just ask as a formality, subject to your

18  counsel's objection, would you personally have a problem

19  producing a copy of that MDD agreement to us?

20    A.  Personally I do not, but, again, there are

21  multiple parties and we would -- I mean, if that's what

22  it meant -- if all other parties agree that could be --

23  that could be put forward.

24    Q.  But you personally don't have a problem with it?

25    A.  I would personally not have a problem with it.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 151

1    Identification.)

2    BY MR. MANISHIN:

3       Q.  I've given you what's been marked as Plaintiffs'

4    Exhibit 16, which I'll state for the record is a

5    reproduction of two JPEG files attached to WhatsApp

6    messages.  I don't know and it's not clear from the

7    excerpts which WhatsApp messages that they were attached

8    to, but I'd like you to look at them and tell me whether

9    you recognize either or both of those excerpts.

10      A.  I do recognize them.

11      Q.  Okay.  Let's take the second one first.  It looks

12   like it's a paragraph numbered 24 that states, "Sorger

13   hereby assumes exclusive responsibility for any matters

14   related to Tarek El-Ghazawi."

15          Can you tell me the nature of whatever agreement

16   or contract that excerpt is from?

17      A.  That contract is the third agreement -- well, the

18   first agreement with -- it went to our presale

19   contracts, so the first agreement with MDD.

20      Q.  And approximately when was that again?  I

21   apologize if you already told me that.

22      A.  It was November 2023.

23      Q.  November of 2023.  Okay.  And the top one that

24   has a number of strikeouts which appears to relate to

25   Mr. Hamid Dalir contemplating returning his interest in

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 152

1   Optelligence in exchange for something, you said you

2   recognize that.  Can you describe the nature of that

3   agreement, if you recall?

4      A.  You mean of that paragraph, with paragraph eight

5   within that agreement?

6      Q.  Yes, the nature of the agreement from which that

7   is apparently excerpted.

8      A.  Well, again, that agreement was a general

9   agreement between Optelligence and MDD to reconcile

10  failed deliverables on presale contracts.

11     Q.  So am I understanding you to say that the

12  paragraphs marked 8 and 24 you believe to have been from

13  the same agreement?

14     A.  I believe so.

15     Q.  Okay.  Do you have a copy of either of those

16  agreements -- of that agreement?

17     A.  If that is that agreement I do have a copy.

18        MR. MANISHIN:  Plaintiffs' Exhibit 17.

19        (Plaintiffs' Exhibit Number 17 was marked for

20  Identification.)

21  BY MR. MANISHIN:

22     Q.  Plaintiffs' Exhibit 17 is a document entitled

23  Board Meeting and Agreement.  Do you recognize that

24  document, sir?

25     A.  I do.

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

Page 162

1    mine and mine alone obviously because I had to do so.

2    But it was also a question of business climate and just

3    partnership and also seeing whether the entity is

4    functional or not, so...

5        Q.  And I think I can conclude with this question.

6    To what extent, if at all, is it your understanding that

7    Optelligence is or is not functional today?

8        A.  Yeah.  Well, it's certainly fair to say, from my

9    perspective at least, that the company is not very

10   functional.  But, again, I don't know where -- I have

11   very little to no insight into what they are doing or

12   Nouri, even unclear -- yeah.  It sounds to me the best

13   suggestion would be to wind up the entity.

14       Q.  What was the ultimate disposition, if any, of the

15   35 percent interest in Optelligence, LLC, that you had,

16   you owned, as a founder?

17       A.  By disposition can you explain that word?

18       Q.  Yes.  Do you still own it or does someone else

19   own it and how did that happen?

20       A.  So who would own the 35 percent if I would not

21   own them anymore is the question?

22       Q.  Let me break it down.  Do you still own

23   35 percent of Optelligence, LLC?

24       A.  This very second I do -- no.  I own 30 percent.

25       Q.  30 percent.  And can you tell me what happened to

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)

5210ca45-b5b4-40ab-a891-8bfde16cbdef

Page 163

1    change your interest from 35 percent to 30 percent and

2    when that happened?  That's compound.  What happened to

3    change your interest from 35 percent to 30?

4        A.   That's the MDD agreement from last year.

5        Q.   And that's the one that we looked at the excerpts

6    from.  Okay.

7             Since you were removed as a director and officer

8    of the company have you received any further dividends

9    or other distribution of cash or any value from

10   Optelligence, LLC?

11       A.   We had -- I think we had a contract that was

12   still going on and -- a government federal contract, and

13   I did receive for -- let's see, that was 2022.  I was

14   receiving for a few months, I think until April or so,

15   2023, or maybe March some -- honestly, I need to check

16   when exactly.  There was some, again, parts that when

17   the contract was still -- I wasn't performing on that

18   and then something came from that.  But in about, yeah,

19   early springtime 2023 anything ceased to come my way

20   from --

21       Q.   I'm not using this term in any legal or technical

22   sense, but would it be fair to characterize that

23   compensation that you referred to from a government

24   contract as sort of a commission?

25       A.   Commission, commission.  No, no.  I mean,

Electronically signed by Ingrid Cox (101-274-436-2096)
Electronically signed by Ingrid Cox (101-274-436-2096)                    5210ca45-b5b4-40ab-a891-8bfde16cbdef